FILED

12/30/2021

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 25, 2021

## STATE OF TENNESSEE v. EDWIN ALFONSO REEVES

**Appeal from the Criminal Court for Knox County**
No. 113628    Bob R. McGee, Judge (at trial and sentencing)
Kyle A. Hixson, Judge (at motion for new trial)

_____

### No. E2021-00015-CCA-R3-CD

_____

The Defendant, Edwin Alfonso Reeves, was convicted by a Knox County Criminal Court jury of Count I, criminally negligent homicide, a Class E felony; and Count II, possession with the intent to sell or deliver a Schedule II controlled substance in a drug-free zone, a Class C felony. *See* T.C.A. §§ 39-13-212 (2018) (criminally negligent homicide); 39-17-417(a)(4), (c)(2)(A) (2018) (subsequently amended) (possession with intent to sell or deliver a Schedule II controlled substance); 39-17-432 (b)(1)(B) (establishing drug-free zones) (2018) (subsequently amended). The Defendant also pleaded guilty to Count III, possession with intent to sell or deliver a Schedule II controlled substance in a drug-free zone. The court sentenced the Defendant to serve two years for criminally negligent homicide, four years for one possession conviction, and three years for the other possession conviction. The court imposed the sentences consecutively to each other, for an effective nine-year sentence, to be served consecutively to a sentence the Defendant was serving at the time of sentencing. On appeal, the Defendant contends that the evidence is insufficient to support his convictions in Counts I and II of criminally negligent and homicide possession of a Schedule II drug, and that the court abused its discretion in imposing consecutive sentences. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and JILL BARTEE AYERS, JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the Appellant, Edwin Alfonso Reeves.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Charme Allen, District Attorney General; Jordan Murray and Kenneth Irvine, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

The Defendant's jury trial convictions for criminally negligent homicide and one count of possession with intent to sell or deliver a Schedule II controlled substance in a drug-free zone relate to events on February 23, 2018, when he sold Oxymorphone which was later used by Jessica Nicely, resulting in her death. The guilty plea conviction for a second count of possession with intent to sell or deliver a Schedule II controlled substance in a drug-free zone relates to events on April 25, 2018.[1]

At the trial, Connie Akin, the victim's mother, testified that the victim would have been age thirty-one if she had been alive at the time of the trial. Ms. Akin said the victim had been married to "Travis" for seven months at the time of her death. Ms. Akin agreed that Travis was "not an honest and truthful person." She said that before the victim's death, Travis did not contact Ms. Akin about the victim's having a substance abuse problem and did not let Ms. Akin know he was providing narcotics to the victim.

Travis Nicely testified that he had been married to the victim at the time of her death in February 2018 and that they had lived together at "her apartment." He said he had been working in a 7:00 p.m. until 7:00 a.m. "night shift" job at the time. He said that he went home after work to pick up the victim on the morning of February 23, 2018, that they went to do some errands, and that they went to a "Dollar Store" to meet the victim's friend, "Connie," whom he later identified as Ms. Wykle. He identified a video recording of his van and Ms. Wykle's car in the Dollar Store parking lot, and the recording was received as an exhibit and played for the jury. He said he did not know who they were meeting until the victim told him after they arrived at the Dollar Store. He said that they waited for Ms. Wykle to arrive, that Ms. Wykle parked next to his van, that the victim told him to give money to Ms. Wykle, that the victim stated Ms. Wykle knew "what it's for," and that he took the money to Ms. Wykle. He said the money was about $160 to $180, which had been from his paycheck that he had cashed earlier that morning. He agreed that Ms. Wykle left, "comes back and then leaves and comes back and then leaves a few times." He agreed that she returned, parked next to his van, handed a large orange pill wrapped in plastic wrap to him, and told him to give it to the victim. He said he gave the pill to the victim but that she did not ingest it while they were in the van. He said they went to a fast food restaurant and then went home. He said that they went to bed around 1:00 p.m., that the victim "kept getting up and down," that his alarm sounded at 4:00 p.m. and that he found the victim lying on her back, having "turned different colors." He said he called 9-1-1 and began CPR until emergency responders arrived. He did not know if the emergency responders gave the victim Narcan.

---

[1] The transcript of the guilty plea hearing for this offense has not been included in the appellate record. At the sentencing hearing, the prosecutor stated that Count III related to a "controlled buy" in which Connie Wykle, working as a confidential informant, purchased drugs from the Defendant.

Mr. Nicely testified that the victim had recently returned from a substance abuse treatment program in California and that he had been unaware she had been using pills. He said he had not seen her take any pills on February 23, 2018, and agreed that he told the 9-1-1 dispatcher that he did not know if she had taken anything. He said he had known that the victim took multiple prescription medications. He acknowledged that he told an officer at the scene that the victim sometimes "snort[ed] Opana" but did not tell the officer about getting a large orange pill at the Dollar Store earlier.

When asked if he spoke with Ms. Wykle after February 23, 2018, Mr. Nicely said that on the day after the victim's death, he received a telephone call in which the person said, "Please tell me this did not happen," that he responded, "It did," and that he asked the caller's identity. He said the person did not respond. He said he "texted her" and asked for the person's identity and that he provided his mother's telephone number for the person to call his mother, but that he never received a response. He later agreed that the person with whom he had this conversation had been Ms. Wykle, that she had not stated her name when she called, and that he tried to call her back but did not receive an answer.

Mr. Nicely testified that he did not tell Detective Booker about other people who provided drugs to the victim, including a downstairs neighbor. Mr. Nicely said that when the neighbor brought pills to sell to the victim, Mr. Nicely gave the victim "two options," telling her "[Y]ou do those, or [sic] I walk away for good." He later said he told the victim, "[Y]ou do that and you do that, you're going to lose me for good. I'll take my few belongings and I will walk out." Mr. Nicely said he told the neighbor that he did not want the drugs in the apartment because the victim was in recovery. He agreed that, to his knowledge, the victim did not get any pills from the neighbor, and he said he left for work within a couple of hours.

Mr. Nicely testified that he and the victim had been separated "about a month before" her death. He agreed that the victim and Ms. Wykle had been friends and roommates "[a]t one point."

Mr. Nicely agreed that people from the apartment's management had knocked on the apartment door earlier in the afternoon. When asked why he did not ask them for help for the victim, he stated that he and the victim had been asleep.

Mr. Nicely agreed that Detective Shaffer called him on March 7 of an unspecified year regarding the investigation of the victim's death. Mr. Nicely said that he had been scared, that he had not initially told Detective Shaffer that he and the victim went to the Dollar Store on the day of her death, and that he did not recall what he initially told Detective Shaffer. Mr. Nicely agreed that when Detective Shaffer showed him photographs, he had said that he "would not recognize" Ms. Wykle and that the victim

"would never let [him] see" Ms. Wykle. Mr. Nicely later said he did not recognize her in the photographs at first but that he recognized her about an hour later. Mr. Nicely agreed that he later said that he went in the Dollar Store and that when he returned, the victim was "passed out" but that he meant "passed out asleep." He said, "I did not know what was going on. I finally got her awake." He acknowledged that he told Detective Shaffer he had left his wallet in the van when he went inside the Dollar Store and that he did not know if the victim "met that lady" while he had been inside the store. Mr. Nicely acknowledged that he had lied and explained he had been scared.

Mr. Nicely agreed that on an occasion other than the March 7 interview, he told Detective Shaffer that the victim would never tell him where she got her drugs. Mr. Nicely agreed that he told Detective Shaffer that the victim would say she needed money but would not tell him why, despite his repeated inquiries. When asked if he told Detective Shaffer that he never talked to Ms. Wykle on the day of the victim's death, Mr. Nicely said he did not remember talking to her that day. He acknowledged that, at some point, he told Detective Shaffer that the victim had left with Ms. Wykle in Ms. Wykle's car but said he had lied because he was scared. He agreed that he showed Detective Shaffer his cell phone's messages and call logs and that the police never "seized" his cell phone. He said the police took the victim's cell phone. He agreed that he had been prescribed narcotics the week before the victim's death and that she kept them in a safe for him. He said he only took one or two of them. Mr. Nicely agreed that he told Detective Shaffer that the victim kept the safe's key in her bra and that the safe had been under the victim's side of the bed at the apartment earlier in the week of the victim's death. Mr. Nicely agreed that the police took a "lockbox," which was a different item than the safe. He said the victim stored her medications in the lockbox. He said that to his knowledge, the police did not search the apartment.

Mr. Nicely testified that he found a straw in the victim's wallet at some point and that he did not know how she used it. When asked if he told Detective Shaffer that the victim crushed and snorted Opana with straws on the day of her death, he said this was what he "was guessing" because he found a plate and two spoons in the sink.

Mr. Nicely acknowledged that he lied several times to Detective Shaffer and stated he did so because he was scared. He acknowledged his 2016 theft conviction.

Knoxville Police Department (KPD) Officer Derrick White testified that on February 23, 2018, he responded to a call regarding a possible drug overdose. He said that when he entered the apartment, fire department personnel were performing CPR on the victim. He thought the fire department personnel administered Narcan to the victim. He said the victim's husband stated that he woke and found the victim unresponsive and then called 9-1-1 "seconds later." Officer White said he collected as evidence a black box containing medication and two empty "baggies" from the apartment. He thought the

-4-

medication in the box had been prescribed to the victim. He said the box was the only evidence he collected. He did not recall having seen any straws or syringes in the apartment.

KPD Investigator Michael Booker testified that he responded to a call regarding a possible drug overdose at the victim's apartment on February 23, 2018. He said that when he arrived, the victim had already been taken from the scene while she was still alive. He said he spoke with the victim's husband, who stated that the victim had used heroin three years ago and that she sometimes used "a big, orange pill for recreational purposes." Investigator Booker said the victim's husband did not tell him that he had taken the victim to the Dollar Store to buy Opana that day. Investigator Booker said that the victim's husband did not mention Ms. Wykle at the time but that the victim's husband later called him to inform him that Ms. Wykle had been trying to call the victim's husband. Investigator Booker said he collected the victim's cell phone as evidence. He agreed that the police did not obtain a search warrant for the apartment. He said he did not see any drug paraphernalia in plain view at the scene and agreed that Opana was often crushed and snorted.

Connie Wykle testified that she and the victim met around 2012 and had been friends and had used pills together. Ms. Wykle said they met through a mutual acquaintance, "Ms. Judy," who sold pills to her and the victim. Ms. Wykle said the victim crushed and snorted the Opana pills she bought from Ms. Judy. Ms. Wykle said that the victim also used Xanax but that the victim mostly used Opana. Ms. Wykle said that she had been addicted to Opana and oxycodone and had been convicted of violating the bad check law in 2003 and theft in 2007 and that both convictions had been related to her drug addiction. She said she had been away from Knoxville and was now taking Suboxone and Neurontin and had not used Opana or oxycodone in over a year.

Ms. Wykle testified that on February 22, 2018, the victim contacted her because the victim wanted help to obtain Opana on February 23. Ms. Wykle identified photographs of text messages between herself and the victim, and the photographs were received as an exhibit. In the messages, the victim asked for two Opana pills, and Ms. Wykle stated that she would send a text message to the Defendant, whom Ms. Wykle knew as "E" and whom she identified in the courtroom, when the victim was "ready." Ms. Wykle said that after receiving a text message from the victim around 10:09 a.m. on February 23, 2018, she met the victim and Mr. Nicely at Dollar General. Ms. Wykle identified a photograph of the car she drove that day, and the photograph was received as an exhibit.

Ms. Wykle testified that when she met the victim and Mr. Nicely at Dollar General, Mr. Nicely got out of the driver's side of the victim's van and came to Ms. Wykle's car with $170. Ms. Wykle said she drove a short distance to the Defendant's apartment, where she was approached by a police officer. She said she went back to the Dollar Store and

called the Defendant to let him know she would return later due to the police presence. She said the Defendant eventually called or sent her a text message to let her know the police were gone. She said that she returned the Defendant's apartment, that he came outside, and that she gave him the money and received three 40-milligram Opana pills. She said she returned to Dollar General, gave Mr. Nicely two pills, and kept one.

Ms. Wykle testified that she called Mr. Nicely on the morning of February 24, 2018, as soon as she learned of the victim's death. Ms. Wykle agreed that she had not been charged with any crimes related to the victim's death. She acknowledged that she sold opiates to the victim. Ms. Wykle agreed that the victim had a "serious opiate addiction."

Ms. Wykle testified that she had two cell phones at the time of the victim's death. When Detective Shaffer interviewed her, he looked at her cell phone text messages for the first cell phone. She said she also had a second cell phone, her "minute phone," which she used when she had not paid the bill for the first cell phone. She said she no longer had the minute phone at the time of the interview because it had stopped working. She explained that she knew she had used the first cell phone on the day of the victim's death because it contained text messages from that date and that she only used the minute phone when the first cell phone was not operational due to her not having paid the bill.

Michael Lamb, an expert in toxicology and an employee of a private laboratory, testified that he conducted toxicology testing on samples collected from the victim by the Knox County Medical Examiner. His analysis showed the presence of the following in the victim's blood: caffeine, naloxone, alprazolam, oxymorphone, trazodone, MCPP, ziprasidone, and Promethazine.

KPD Sergeant Joshua Shaffer, an expert in drug investigations, testified that Opana was the brand name of oxymorphone, a narcotic in the opiate class. He said that Opana was a central nervous system depressant and that it was "one of the stronger" opiates. He said 40-milligram extended release pills were the most common "on the street" "in this area." He said they were generally ground or crushed and then snorted or injected, with snorting being the more common method of use.

Sergeant Shaffer testified that drug dealers often used nicknames in order to conceal their identity and that drug dealers used cell phones to communicate with customers. Sergeant Shaffer said his investigation showed that Ms. Wykle knew the Defendant as "E."

Sergeant Shaffer testified that he was contacted by the medical examiner to investigate the victim's drug overdose. He said he learned that Investigator Booker had collected the victim's cell phone as evidence. Sergeant Shaffer said he examined the contents of the cell phone after the victim's husband provided the passcode. He said the victim's cell phone contained a record of communication with a telephone number that he

identified as belonging to Ms. Wykle. He said he determined from the text messages stored in the victim's cell phone that Ms. Wykle had to buy drugs from another person. He said he obtained the victim's cell phone provider's records relative to communications involving the victim's cell phone, from which he made notes, and the notes were received as an exhibit. He said the records showed activity reflecting that the victim communicated with Ms. Wykle the day before the victim's death about "setting up a deal" and that the communication to complete the deal continued the next day. He said his investigation also showed cell phone communication occurred between Ms. Wykle's cell phone number and a cell phone number registered to Eric Reed at a fictitious address but which Sergeant Shaffer determined was the cell phone number Ms. Wykle used to contact the Defendant. Sergeant Shaffer noted that communications between Ms. Wykle and the victim were followed by Ms. Wykle's communicating with the Defendant. He identified Ms. Wykle's cell phone records and Mr. Reed's cell phone and text message records for February 23, 2018, and the documents were received as exhibits.

Sergeant Shaffer identified a video recording from the victim's apartment complex, a portion of which was played for the jury. The recording showed the victim and Mr. Nicely leaving and later returning to their apartment on the morning of February 23, 2018. Sergeant Shaffer said the recording did not show the victim and Mr. Nicely leaving the apartment between their return at around 1:48 a.m. and the arrival of EMTs around 4:33 p.m. He said the recording showed a woman with a key and a man knock and enter each apartment, including the victim's apartment. He said this appeared to be a "unit inspection, which occurs routinely up there." He said the woman and man entered the apartment about seven minutes before the EMTs arrived. He said no one other than the woman with the key and the man with her entered or left the victim's apartment in the time between the victim and Mr. Nicely's return and the arrival of EMTs.

Sergeant Shaffer testified that he interviewed Mr. Nicely, who eventually admitted that the victim contacted "someone" who Mr. Nicely and the victim met at a Dollar Store. Sergeant Shaffer said that Mr. Nicely stated that Mr. Nicely had "given [money] to that person and had received what he thought to be orange pills that [Mr. Nicely] brought back and gave to [the victim]." Sergeant Shaffer acknowledged that Mr. Nicely initially claimed that he did not know if the victim met Ms. Wykle at the Dollar Store, that the victim never told Mr. Nicely where she obtained drugs, that Mr. Nicely never talked to Ms. Wykle on the day of the victim's death, and that Mr. Nicely came out of the Dollar Store and found the victim unconscious. Sergeant Shaffer agreed that Mr. Nicely had initially denied giving the victim money to purchase drugs and that Mr. Nicely stated he did not remember meeting anyone or going anywhere other than to the Dollar Store.

Sergeant Shaffer testified that based upon information provided by Mr. Nicely, he began searching for Ms. Wykle. He said that she contacted the police because she heard they were looking for her. He said Ms. Wykle was forthcoming about her role in obtaining

money from Mr. Nicely and providing pills to Mr. Nicely, which Ms. Wykle knew, based upon her prior communications with the victim, were for the victim. Sergeant Shaffer said Ms. Wykle explained she had come to and left the Dollar Store repeatedly because of the police presence near the Defendant's home. Sergeant Shaffer said Ms. Wykle identified the Defendant from a photograph lineup as the person from whom she purchased drugs on the victim's behalf. Sergeant Shaffer said the fictitious address associated with the cell phone registered to "Eric Reed" had the same street address but a different city as the Defendant's address in Knoxville.

Sergeant Shaffer testified that he obtained a prescription medication record for the Defendant from the "controlled substance monitoring database," which reflected that the Defendant received a three-day prescription for oxycodone on February 20, 2018. He agreed that oxycodone and oxymorphone were "two completely different substances."

Sergeant Shaffer acknowledged that the "crime lab" and the medical examiner never went to the victim's apartment and that no search warrant was executed for the victim's apartment. He agreed that officers who responded to the 9-1-1 call regarding the victim's overdose collected prescription pill bottles as evidence. He agreed that the victim's prescribed medication collected by the officers included trazodone, alprazolam, gabapentin, and tizanidine. He agreed that no oxycodone or Opana was found at the scene. He agreed that Opana was coated "to try to deter drug abusers," who ground the pill and snorted the residue. He agreed that no items which could be used to grind pills or to snort ground pills were found at the scene. He agreed the absence of these items could be consistent with "cleaning the scene." He agreed that the police did not search the victim's van. He agreed that he did not seize Mr. Nicely's cell phone and did not obtain Mr. Nicely's cell phone records.

Sergeant Shaffer agreed that Ms. Wykle had two cell phones when he interviewed her in April of an unspecified year. He said Ms. Wykle stated that she had one cell phone at the time of the victim's death and that she obtained the second one later.

Knox County KUB Geographic Information Systems employee Donna Roach, an expert in mapping, testified that she created two maps depicting the Defendant's apartment complex and a park. The maps were received as exhibits. Ms. Roach said the distance between the "far end of the apartment complex" and the park was 937′ and that the distance from the front of the apartment complex to the park was 459′. She said the entire apartment complex was within 1000′ of the park. She said it "did not look like" an entrance to the park faced Dutch Valley Road, the road which provided access to the apartment complex, and agreed "there's a bunch of weeds and trees and brush and bars [sic] between there."

Knoxville Parks and Recreation Department employee Monica Crutcher testified that a map previously received as an exhibit showed Adair Park had operated as a park

"[l]ong before February of 2018." She agreed that the park did not have an entrance on Dutch Valley Road, that the entrance for cars was on Adair Drive, and that the park would be accessible on foot from Dutch Valley Road.

Knox County Chief Medical Examiner Darinka Mileusnic-Polchan, M.D., an expert in forensic pathology, testified that she performed the victim's autopsy.

Dr. Mileusnic-Polchan testified that, in her opinion, the victim's cause of death was oxymorphone and alprazolam intoxication. Dr. Mileusnic-Polchan said the concentration of oxymorphone alone was sufficient to cause death and that she had never seen a person whose tolerance was such that the person could survive with a concentration as high as the victim had. She characterized the combination of oxymorphone and alprazolam as an "exceptionally . . . bad combination." She agreed that the extended-release oxymorphone could be smoked; crushed and snorted; or crushed, mixed with liquid, and injected, and that all of these methods of ingestion would deliver a strong, immediate effect and would defeat the extendedirelease feature of the formulation. Dr. Mileusnic-Polchan said that, in her opinion, the victim had died "relatively quickly" due to "the surge of the drug in the system," as evidenced by the mild edema of victim's brain and the minimal contents of the victim's "genital urine system."

Dr. Mileusnic-Polchan testified that she did not see evidence that the victim had swallowed pills. Dr. Mileusnic-Polchan said that the victim's concentration of oxymorphone was such that "quite a number of . . . tablets" would have to be swallowed in order for the victim to have had the corresponding concentration shown in the toxicology results.

Dr. Mileusnic-Polchan identified her report and the toxicology report, and they were received as exhibits.

Dr. Mileusnic-Polchan testified that the victim had naloxone in her system, which she said was not from Suboxone because no buprenorphine was present. Dr. Mileusnic-Polchan said that although the victim had trazodone and sprazadone in her system at the time of her death, they were not factors in the cause and manner of death. Dr. Mileusnic-Polchan agreed that the victim had a prescription for alprazolam and that a person who received an alprazolam prescription should be instructed about the "strong danger of interaction with other drugs." Dr. Mileusnic-Polchan agreed that physicians were not supposed to prescribe alprazolam and opiates together. She agreed that alprazolam and Opana should not be used together.

University of Tennessee College of Pharmacy Professor Emeritus Glen Farr, a Doctor of Pharmacy, testified as a defense expert in pharmacology. Dr. Farr had reviewed the KPD incident report, the autopsy report, the toxicology report, the Controlled Substance

Monitoring Database (CSMD) for the victim, journals, textbooks, professional treatises, and a computerized database for drug information.

Dr. Farr testified that the "big, orange pill" referred to in the reports he received was consistent with forty-milligram, extended release Opana, also known as oxymorphone. He said Opana had been removed from the market in September 2017 and that the drugs involved in this case were likely from a generic manufacturer. Dr. Farr said the twenty-six nanograms per milliliter in the victim's system was just above the minimum threshold of the therapeutic range, which was twenty-five to 102 nanograms per milliliter. Dr. Farr said the Food and Drug (FDA) had issued a "black box warning" regarding the use of benzodiazepines, including alprazolam, in combination with opiates, including oxymorphone. He said pharmacists were required to warn patients receiving alprazolam prescriptions about the danger of use with opiates.

Dr. Farr identified naloxone, also known as Narcan, as an opiate-reversing agent. He said naloxone could be used by first responders to wake someone from an opiate-induced coma or respiratory depression. He said that the victim's naloxone level could have been from Narcan or from Suboxone. He said the records he reviewed reflected that the victim had been prescribed Suboxone, an oral treatment for opiate abuse disorder which contained buprenorphine and naloxone. He said that if an opiate were snorted or injected, it would block the effects of buprenorphine in Suboxone. He said he could not determine from a laboratory report whether the victim had taken Suboxone. He said that death from opiate overdose might happen as quickly as two to five minutes after a person stopped breathing and that prompt Narcan administration was required to prevent death.

Dr. Farr testified that promethazine, an anti-nausea medication which the victim had been prescribed, had a synergistic effect with opiates for relieving pain and that it provided relief from the nausea commonly associated with opiate use. He said promethazine could be misused to increase the effect of opiates.

Dr. Farr testified that snorting an opiate "greatly enhances the absorption." He said that the FDA required extended-release opiates to be manufactured with an "abuse deterrent system" which made it difficult to crush the pills but that it was still possible to crush the pills. He said forty-milligram oxymorphone pills were the highest concentration available and were intended for severe pain relief. He said a forty-milligram, extended release tablet was intended to deliver one-twelfth of forty milligrams for twelve hours but that crushing and snorting it would result in the immediate delivery of forty milligrams.

Dr. Farr testified that the amount of oxymorphone needed to cause death was thirty to 120 nanograms per milliliter. He said the victim's level of oxymorphone was "more than would be expected from two 40-milligram extended release oxymorphone" pills. He explained that studies showed that the bioavailability of crushed oxymorphone was about

40%, with one study showing 43% if the oxymorphone were "crushed to the ultimate level." He said that if the victim had thoroughly crushed two forty-milligram pills, she would have about half the level of oxymorphone that was found in the toxicology analysis. In his opinion, the victim could not have reached the oxymorphone level she had with only two forty-milligram oxymorphone pills. He further opined that four to six pills would be required to reach the victim's level of oxymorphone. Dr. Farr said oxymorphone had 100% bioavailability if administered intravenously. He said, however, that he found no evidence in the records he reviewed that the victim had injected oxymorphone. In Dr. Farr's opinion, the victim's prescribed trazodone and ziprasidone would not have a clinically significant interaction with oxymorphone. Dr. Farr identified his report, which was received as an exhibit.

Dr. Farr testified that he agreed with Dr. Mileusnic-Polchan that the victim's death had been caused by "oxymorphone, with Alprazolam being a factor."

Dr. Mileusnic-Polchan was recalled on rebuttal and testified that the calculations in Dr. Farr's report regarding the level of oxymorphone which would be present in a person's body based upon nasal ingestion of two forty-milligram oxymorphone pills were mathematically incorrect. She said he had calculated the rate for one, rather than two forty-milligram pills. She said that opinions of this nature should be given by forensic toxicologists and forensic pathologists. She said that, however, the American Board of Forensic Toxicology had stated that forensic toxicologists and forensic pathologists should refrain from offering several types of opinions, including extrapolations of the level in a person's body for drugs other than alcohol. She said that such calculations were "extremely unreliable" and were "not a scientific method." She noted that unlike alcohol, drugs did not metabolize or excrete in a "slope and linear relationship."

After receiving the evidence, the jury found the Defendant not guilty of the charged offense in Count I of second degree murder, but it found him guilty of the lesser-included offense of criminally negligent homicide. For Count II, the jury found the Defendant guilty of the charged offense of possession with the intent to sell or deliver a Schedule II controlled substance in a drug-free zone. The Defendant later pleaded guilty to a second count of possession with intent to sell or deliver a Schedule II controlled substance in a drug-free zone, which had been severed from Counts I and II, with an agreed three-year sentence to be served consecutively to the sentence to be imposed in Count II. At a sentencing hearing, the trial court sentenced the Defendant to serve two years for criminally negligent homicide and four years for the possession conviction in Count II. The court imposed the sentences for Counts I and II consecutively to each other and the sentence for Count II consecutively to the agreed three-year sentence in Count III, for an effective nine-year sentence, all of which was to be served consecutively to a sentence for a previous conviction. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions. His argument, however, addresses only the criminally negligent homicide conviction and not the drug possession conviction. We will confine our analysis to the challenge of the criminally negligent homicide conviction. *See* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived by this court.").

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Criminally negligent conduct that results in death constitutes criminally negligent homicide." T.C.A. § 39-13-212 (2018).

> "Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]

*Id.* § 39-11-106(a)(5) (2018) (subsequently amended).

The Defendant argues that the State failed to establish that his conduct in selling pills to Ms. Wykle was criminally negligent and that the State did not adequately show that his conduct caused the victim's death due to "multiple intervening causes." He argues that the intervening causes include Ms. Wykle's "selling" pills to Mr. Nicely, Mr. Nicely's providing the pills to the victim, the victim's crushing and snorting the pills, and the victim's mixing the pills with her other medication. The Defendant cites no authority to support his factual arguments regarding intervening causes.

Viewed in the light most favorable to the State, the evidence shows that the victim contacted Ms. Wykle for assistance in obtaining pills. Ms. Wykle, in turn, contacted the Defendant about purchasing pills. After Ms. Wykle met the victim and Mr. Nicely and received money from Mr. Nicely, she went to the Defendant's apartment and bought three Opana pills with the money she received from Mr. Nicely. She returned to the store where she had met Mr. Nicely and the victim earlier, and she gave two of the pills to Mr. Nicely, who gave them to the victim. The victim and Mr. Nicely went home, and after napping, Mr. Nicely found the victim unresponsive and called the authorities. Mr. Nicely testified that the victim was a drug addict, and he told Detective Shaffer that he thought the victim might have crushed and snorted the Opana pills. Other evidence showed that crushing and snorting opiate pills was a common form of ingestion employed by drug abusers, which was common enough to be known to law enforcement and medical personnel. The victim died from a drug overdose, and her toxicology report showed a fatal amount of oxymorphone, the drug in Opana, in her system. Although the victim also had alprazolam in her system, which provided a synergistic effect with opiates, including oxymorphone, the amount of oxymorphone in her system alone was enough to cause death. The evidence showed that oxymorphone was a powerful, often abused opiate; that the safety coating on the pills were often defeated by crushing the pills and snorting the residue; and that the Defendant illegally sold three oxymorphone pills to Ms. Wykle. A rational jury could conclude from the evidence presented that the Defendant should have been aware of a substantial and unjustifiable risk that his selling the pills to Ms. Wykle would result in a person's death through drug abuse and that the Defendant's failure to perceive the danger of his conduct was "a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the [Defendant]'s standpoint." *See id.*

Regarding the Defendant's argument about intervening causes of the victim's death, we again note Dr. Mileusnic-Polchan's testimony that the cause of death was oxymorphone and alprazolam intoxication and that the concentration of oxymorphone alone was sufficient to cause death. A rational jury could conclude that the intervening circumstances of the drugs passing from one person to another; the victim's crushing the pills and snorting them for a strong, immediate effect; and her using the pills with another drug were

-13-

foreseeable circumstances and that the Defendant's disregard of which was a gross deviation from the standard of care for an ordinary person in the Defendant's circumstances. *See State v. Farner*, 66 S.W.3d 188, (Tenn. 2001) (stating, in a case involving a death resulting from drag racing, that proximate cause for criminally negligent homicide is established by showing that the victim's death was the natural and probable result of the defendant's conduct and that the defendant's conduct "need not be the sole or immediate cause of the victim's death"); *cf. State v. Randolph*, 676 S.W.2d 943, 948 (Tenn. 1984) ("[T]he act of the customer in injecting himself [with heroin] is not necessarily so unexpected, unforeseeable or remote as to insulate the seller from criminal responsibility [for murder or manslaughter under prior statutes] as a matter of law.").

The evidence is sufficient to support the Defendant's conviction for criminally negligent homicide.

## II

### Sentencing

The Defendant contends that the trial court abused its discretion in determining the length of his sentences and in imposing consecutive sentences for the jury trial convictions in Counts I and II. This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, the potential for rehabilitation or treatment, and the result of the validated risk and needs assessment. T.C.A. §§ 40-35-103 (2019), -210 (2019); *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2019).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as

provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id.* A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2019). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2019); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

At the sentencing hearing, the presentence report was received as an exhibit. It reflected the following: The thirty-four-year-old Defendant had one prior Tennessee felony drug conviction. In addition, he had Michigan convictions for misdemeanor drug possession, driving under the influence, three counts of driving while his license was suspended, and failure to use a safety belt or child restraint. He had a pending assault charge in Michigan and a pending probation violation warrant[2] in Tennessee. He was a high school graduate with a welding certification, and he reported fair mental and physical health. He began using marijuana at age fourteen and continued using it until his present incarceration. He also reported occasional cocaine use, beginning at age twenty-four, and twice-weekly Xanax use, beginning at age twenty, until his present incarceration. He reported cough syrup abuse, beginning at age thirty. He had three children. He reported that he had worked "under the table" in the plumbing trade and had not had other employment in the past ten years. The Strong-R Risk Assessment Tool categorized the Defendant as "High (Violent)" regarding his likelihood to reoffend.

A judgment for the Defendant's January 31, 2017 conviction for manufacture, delivery, sale, or possession of a Schedule I controlled substance was received as an exhibit. It reflected that the Defendant received an eight-year sentence.

Three of victim's family members provided victim impact statements to the trial court.

---

[2] The attorneys expressed uncertainty about whether the Defendant's probation had been revoked or whether the probation violation warrant was still pending. At the hearing, the trial court resolved the uncertainty by stating that the Defendant's probation was revoked.

The Defendant stated the following in his allocution: He was sorry for "what role [he] played in what transpired and what happened." He offered condolences to the victim's family and said what had happened "wasn't meant to happen."

The trial court found that two enhancement factors applied: First, the court found that the Defendant had a criminal history in addition to that required to establish his range classification. *See* T.C.A. § 40-35-114(1) (2019) (subsequently amended). The court found, as well, that the Defendant violated the conditions of release into the community based upon his having been on probation when he committed the offenses. *See id.* at (13)(C). The court did not find that any mitigating factors applied. *See id.* § 40-35-113 (2019).

In further considering the length of the individual sentences, the trial court made the following observation:

> And the court is mindful and has seen case after case involving drugs that are coming down from Detroit, Chicago and places north. And people have set up extensive drug dealing networks in Knox County, Tennessee. Knox – Tennessee, in general, has one of the worst records of drug activity in . . . the nation. And Knox County's one of the worst places in the state. So it is a very serious problem. And the Court needs to do whatever it can to deter people from coming down here and selling poison in our county. The Court finds that some enhancement is called for under these circumstances. I won't set the sentence at the maximum, but they will be enhanced somewhat.

The trial court sentenced the Defendant to two years for Count I, the homicide conviction, and to four years for Count II, the drug sale conviction.

Regarding concurrent or consecutive service, the trial court found that the Defendant was a professional criminal who had knowingly devoted his life to criminal activity and that the Defendant committed the offenses while was on probation. *See id.* § 40-35-115(b)(1), (6) (2019). The court noted that, by the Defendant's own account, he had not engaged in "legal" employment for ten years. The court also noted that the Defendant had been convicted of selling drugs and that he continued to sell drugs while on probation. Based upon these factors, the court imposed Counts I and II consecutively to each other. The plea agreement for Count III provided for consecutive service with Count II. The court also ordered that the sentences for this case be served consecutively with the sentence the Defendant was serving for his prior drug conviction.

The Defendant argues that the trial court abused its discretion in relying upon the Defendant's having come from Detroit when it enhanced the length of the sentences. The court's comments reflect its concern that drug dealers from other locations were

transporting drugs from elsewhere and selling them in its jurisdiction. Deterrence is a relevant consideration in determining the manner of service of a sentence. *See* T.C.A. § 40-35-103(1)(B). The record reflects that the prosecutor recited relevant statistics regarding drug overdose deaths complied by the Drug Overdose Task Force for 2017, 2018, and 2019-to-date. The prosecutor stated:

> [W]e are dealing with an incident where individuals are coming from northern cities, specifically, Detroit and also some from Chicago, and they are coming down into Knox County to sell narcotics within Knox County, essentially, for more profit. They're preying on citizens of this community for profit. And, Judge, I think that a sentence in this case would act as effective deterrence to those individuals who are coming down here to essentially sell poison within Knox County, Tennessee.

The prosecutor argued, as well, that the Defendant had committed the present offenses while on probation for selling drugs from the same apartment complex as the one from which he sold drugs to Ms. Wykle in the present case. Likewise, the prosecutor noted that after the Defendant committed the offenses in Counts I and II, he conducted the drug sale involved in Count III, in which Ms. Wykle, "acting as a confidential informant, ma[de] contact with [the Defendant] after he had returned from up north with more drugs, . . . [and] conducted another controlled buy[.]" As we have stated, the transcript of the guilty plea hearing for Count III is not in the record, but the defense did not dispute the accuracy of the prosecutor's statements at the sentencing hearing about the Defendant's having brought drugs from outside Tennessee to Knox County. Likewise, the defense did not challenge the accuracy of the drug overdose statistics. We acknowledge that the Sentencing Act contemplates that a court consider the need for deterrence in determining the manner of service of a sentence, rather than in determining the length of the sentence, and that the Defendant's sentences in Counts II and III required confinement because they involved offenses committed in a drug-free zone. *See id.* § 39-17-432 (c)(1) (2018) (subsequently amended). Deterrence remained a relevant consideration to the manner of service for the homicide. To the extent that the court considered the need for deterrence in determining the length of the sentences, we note that "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the [Sentencing] Act." *See Bise*, 380 S.W.3d at 706.

In that regard, the trial court enhanced the Defendant's sentences for Counts I and II based upon its findings regarding the existence of two statutory enhancement factors, that the Defendant had a criminal history in addition to that required to establish his range classification and that he committed the present offenses while on probation. *See* T.C.A. § 40-35-114(1), (13)(c). The Defendant does not argue that the court erred in its findings regarding these enhancement factors, and the record supports the court's findings. The

-17-

court did not abuse its discretion in imposing sentences of two years for Count I and four years for Count II.

The Defendant also argues that the trial court abused its discretion in imposing consecutive sentences based upon its finding that the Defendant was a professional criminal. *See id.* §40-35-115(b)(1). The record reflects that the Defendant reported no gainful employment in the past ten years, aside from undocumented plumbing labor, that he had engaged in multiple drug transactions in the present case, that he committed the present offenses while on probation for a Tennessee drug conviction, that he had a pending Michigan assault charge, that he had a prior Michigan drug possession conviction, and that Ms. Wykle knew him as a person who sold drugs. The record supports the court's finding that the Defendant was a professional criminal. Additionally, the court relied upon a second consecutive sentencing factor, that the Defendant committed the present offenses while on probation. *See id*. at (b)(6). The Defendant does not challenge the court's application of this consecutive sentencing factor, and the record supports the court's determination. The court did not abuse its discretion in imposing consecutive sentences.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____

ROBERT H. MONTGOMERY, JR., JUDGE